UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
LINDA POWELL,

                Plaintiff,

      -against-

THE DEPARTMENT OF EDUCATION OF
THE CITY OF NEW YORK and THE
BOARD OF EDUCATION OF THE CITY
SCHOOL DISTRICT OF NEW YORK,

                Defendants.
--------------------------------------------------------X

**MEMORANDUM & ORDER**
14-CV-2363 (PKC)(SLT)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Linda Powell brings this action against Defendant Department of Education of the

City of New York (the "DOE")[1] for discrimination in violation of the Americans with Disabilities

Act ("ADA") and retaliation in violation of the Family and Medical Leave Act ("FMLA").  Before

the Court is Defendant's motion for summary judgment.  For the reasons stated below, Defendant's

motion is granted.

## BACKGROUND

**I.**    **Relevant Facts**[2]

      Plaintiff Linda Powell is a retired teacher who was employed by Defendant DOE from

1998 until she retired in 2013.  (Defendant's 56.1 Statement ("Def.'s 56.1"), Dkt. 51, at ¶¶ 1, 120.)

At the beginning of the 2011-2012 school year, Plaintiff was hired by Arnette Crocker, the

principal of the Women's Academy of Excellence ("Women's Academy"), to teach eleventh grade

---

[1] DOE is sued herein as the "Department of Education of the City of New York" and the "Board of Education of the City School District of New York."

[2] Unless otherwise noted, a standalone citation to Defendant's 56.1 Statement denotes that this Court has deemed the underlying factual allegation undisputed.  Any citations to Defendant's 56.1 Statement incorporates by reference the documents cited therein.  Where relevant, however, the Court may cite directly to the underlying document.

United States history.  (*Id.* at ¶ 4.)  Powell was supervised by Principal Crocker, as well as Assistant Principals Laverne Lewis and Eric Ford.  (Plaintiff's 56.1 Statement ("Pl.'s 56.1"), Dkt. 57, at ¶ 6.)  Plaintiff suffers from a number of medical conditions, including Irritable Bowel Syndrome ("IBS"), Barrett's Esophagus, hypertension, heart palpitations, depression, incontinence, and post-traumatic stress disorder ("PTSD").  (Def.'s 56.1, at ¶ 7.)  She has had IBS since 2004, hypertension since approximately 2010, heart palpitations since 2011, depression since October 2012, incontinence since 2013,[3] and PTSD since 2011.  (*Id.* at ¶¶ 8, 12, 15, 18; Pl.'s 56.1, at ¶¶ 9, 11, 16.)

On January 12, 2012, Plaintiff submitted a request to Principal Crocker for FMLA leave beginning on January 20, 2012, with a probable return date of April 20, 2012, to address her heart palpitations and PTSD.  (Def.'s 56.1, at ¶¶ 31-33.)  Plaintiff's leave was approved by Crocker on January 13, 2012.  (*Id.* at ¶ 34.)  In order to ensure that Plaintiff had a teaching evaluation prior to the end of the school year, Crocker and Lewis arranged to observe one of Plaintiff's classes in January 2012.  (*Id.* at ¶ 36.)  On January 17, 2012, Assistant Principal Lewis met with Plaintiff to discuss Lewis's impending observation of Plaintiff's eleventh grade history class.  (*Id.* at ¶ 19.)  According to Plaintiff, this meeting was a "forced unplanned pre-observation meeting." (Declaration of Linda Powell ("Powell Decl."), Dkt. 56, at ¶ 14.)  Plaintiff asserts that the parties agreed that the observation would take place on January 19, 2012.  (*Id.*)

On January 18, 2012, Crocker and Lewis observed Plaintiff's class, it was the first such teaching observation for Plaintiff at Women's Academy.  (Def's 56.1, at ¶¶ 20-21.)  The following

---

[3] In paragraph 9 of Plaintiff's 56.1 Statement, she states that her incontinence started in 2013.  However, in paragraph 10, she admits that in her disability application to the Teacher's Retirement System of the City of New York, she stated that her "episodes of incontinence have increased from once a month to 3-4 times a month as of the summer of 2012."  (Pl.'s 56.1, at ¶¶ 9-10.)  Additionally, Plaintiff does not recall when her Barrett's Esophagus began, but it was likely before 2011.  (*Id.* at ¶ 11.)

day, Lewis met with Plaintiff to discuss the observation, and informed her that Crocker had instructed Lewis to give Plaintiff a "U", or "unsatisfactory", rating for the observation. (*Id.* at ¶ 22.) The Observation Report, written by Lewis and Crocker, stated that the January 18 lesson was "unsatisfactory", and gave Plaintiff a number of recommendations for improvement. (Def.'s 56.1, at ¶¶ 23-24.) Plaintiff did not sign the report where it stated that she had "read and received an original of this report and underst[oo]d that a copy [would] be placed in [her] file." (Dkt. 53-6, at ECF 2.)[4] According to Plaintiff, the unsatisfactory evaluation was expunged after she filed a grievance through her union. (Deposition of Linda Powell ("Powell Dep."), Dkt. 53-2, at 139:14-140:5.)[5]

On January 20, 2012, Plaintiff began her FLMA leave. During her absence, one or more teachers were assigned to teach her eleventh grade history class. (Def.'s 56.1, at ¶ 41.) Before the expiration of her FLMA leave, Plaintiff sought Restoration of Health Leave in order to extend her leave from April 20, 2012 to October 2, 2012. (*Id.* at ¶ 38.) On April 30, 2012, Plaintiff submitted a "Declaration of Intention Form (2012-2013)" stating that she would be continuing her position at Women's Academy for the 2012-2013 school year. (*Id.* at ¶ 42.) In response to a question asking Plaintiff to list three subjects she would be "interested in teaching, in order of preference" for the next school year, Plaintiff listed twelfth grade civics, twelfth grade economics, and, lastly,

---

[4] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[5] Plaintiff argues that the January 18, 2012 observation should have been classified as "informal" because Lewis and Crocker "not only . . . show[ed] up a day in advance, but they purposely showed up to a class that had been agreed upon during the pre-observation as the main class not to be observed because it was overcapacity and in violation of the union contract." (Powell Decl., ¶ 14.) According to Plaintiff, the classification of the observation as "formal" or "informal" is significant because an informal observation is "written up as either a satisfactory or as a warning, not as an unsatisfactory [that] can be based and used in a year-end evaluation." (Powell Dep., at 139:1-5.)

eleventh grade history. (*Id.* at ¶ 45.) On June 22, 2012, Crocker rated Plaintiff "unsatisfactory" for the 2011-2012 school year based on the January observation. (*Id.* at ¶ 26.) Plaintiff learned about the year-end unsatisfactory rating during a meeting on October 23, 2012 between Plaintiff, Crocker, and Lewis. (*Id.* at ¶¶ 27-29.)[6]

When Plaintiff returned to Women's Academy in October 2012, Plaintiff was assigned to teach English and creative writing. (*Id.* at ¶ 46.) A substitute teacher, Pasqual Pelosi, was assigned to, and was teaching, twelfth grade history. (*Id.* at ¶ 47.) At some point during the marking period, Plaintiff learned from students that Crocker took a vote of the twelfth grade asking whether the students wanted Plaintiff to return as the history teacher. (*Id.* at ¶¶ 51-52.) According to Defendant, this vote was done to determine *when* Plaintiff would return to teaching history, *i.e.*, during the current marking period or starting the following marking period. (Deposition of Arnette Crocker ("Crocker Dep."), Dkt. 53-4, at 29:2-16, 31:11-32:21.) According to Plaintiff, she was told by students that the vote was done in the auditorium, in front of the entire class, and the students were asked *if* they wanted Plaintiff to return or to keep Pelosi. (Pl.'s 56.1, at ¶ 53.)

At the beginning of the next marking period, Plaintiff began teaching twelfth grade history. (Def.'s 56.1, at ¶ 50.) On November 27, 2012, Crocker and Lewis had a pre-observation meeting with Plaintiff, and then observed her twelfth-grade history class on November 29, 2012. (*Id.* at ¶¶ 58-59.) Crocker and Lewis rated Plaintiff's observation "satisfactory". (*Id.* at ¶ 60.) On April 8, 2013, Plaintiff, Crocker, and Lewis met for a post-observation conference. (*Id.* at ¶ 61.) In the observation report, it was noted, *inter alia*, that "[t]he lesson observed was not consistent with the lesson planned. . . . You planned to begin the lesson by presenting and discussing a poster or flyer

---

[6] However, in her brief, Plaintiff asserts that "on May 16, 2013, Plaintiff reviewed her personnel file, and discovered a U-rating [that] . . . Plaintiff had never seen", nor signed. (Plaintiff's Brief ("Pl.s Br."), Dkt. 55, at 6.)

of the movie 'Lincoln' as the mini-lesson[.] . . . Instead, you presented a poster of vocabulary terms[.]" (November 29, 2012 Observation Report, Dkt. 53-15, at ECF 2; Def.'s 56.1, at ¶ 62.) Plaintiff told Lewis and Crocker that she had asked Assistant Principal Ford to duplicate the poster, most recently on the morning of November 29, 2012. (Def.'s 56.1, at ¶¶ 63-65.) Plaintiff alleges that, at Crocker's direction, and despite having used such demonstratives in the past, Ford refused to make her the poster and its absence negatively affected Plaintiff's observed lesson. (Pl.'s 56.1, at ¶¶ 66-68.) At her deposition, Plaintiff testified that when she asked Ford why Crocker had told him not to make the poster, he replied, "as a part of a school-wide policy, [he] was not to make posters for short term events." (Def.'s 56.1, at ¶ 67.) This was a school-wide policy. (*Id.* at ¶ 69.)

In December 2012, Plaintiff planned to take her class on a trip to see the movie "Lincoln", but, according to Plaintiff, "Crocker attempted to frustrate Plaintiff's class trip by imposing several last-minute requirements[,]" including requirements relating to permission slips, attendance, and uniforms. (Pl.'s 56.1, at ¶¶ 70-71.) The eleventh-grade history teacher planned to take his class on this same field trip. (Def.'s 56.1, at ¶ 72.) According to the Women's Academy Handbook, teachers must use "the city-wide approved Trip Permission Slips" for field trips. (*Id.* at ¶ 73.) Plaintiff testified at her deposition that after she handed out permission slips to her students, she was told that the permission slips were not valid and that she needed to hand out different slips. (Powell Dep., at 71:13-18.) She further testified that she was given the incorrect slips, created by the school, to hand out. (*Id.*) However, Plaintiff testified in a later proceeding that the permission slips she handed out were "something that [she] drafted with another teacher" and not the city-wide approved slips. Furthermore, the permission slips that were recalled were the same ones given out to the eleventh grade, which also had to be recalled. (Def.'s 56.1, at ¶¶ 76-77.)

Plaintiff also alleges that a "few days" before the field trip, she was told that students would have to wear their uniforms and that 80% of the class had to attend the field trip in order for it to take place. (Powell Dep., at 71:18-25, 73:5-8.) The Women's Academy Handbook states, "[t]rips that will involve an entire grade will require 75% participation from students in that grade" (Def.'s 56.1, at ¶ 82), but Plaintiff alleges that she was told she needed 80% attendance (Powell Dep., at 71:18-25). The 80% attendance and uniform requirements also applied to the eleventh-grade class. (Def.'s 56.1, at ¶¶ 80, 83.)[7]

On March 4, 2013, Plaintiff submitted an FMLA request form to Women's Academy payroll secretary, Stephanie Adams, to take three days off to care for her daughter. (*Id.* at ¶ 84.) The following day, on March 5, 2013, students found the FMLA request forms in the main office and brought them to Plaintiff's classroom. (*Id.* at ¶ 86-87.) According to Plaintiff, her papers were left on a student's desk in "a public area for anyone to see." (Pl.'s 56.1, at ¶ 86; Powell Dep., 84:1-85:24.) Plaintiff "was shaken" by the students finding her documents. (Powell Dep., at 86:19-25.) She called Adams for coverage, stayed in the bathroom from second through fourth periods, and then went home. (Def.'s 56.1, at ¶¶ 87-89, 91.) A non-teacher was sent to cover Plaintiff's class. (*Id.* at ¶ 88.) While Plaintiff was in the bathroom, Adams came in and apologized to Plaintiff for leaving her paperwork out in the public area and told Plaintiff that it was not done purposely. (*Id.* at ¶ 90.) When Plaintiff got home, she told her adult daughter about what had happened and her daughter called Adams. (*Id.* at ¶¶ 92-93.) According to Plaintiff, who learned about the call from her daughter, her daughter asked Adams "if she had a problem with [Plaintiff], and [asked]

<hr>

[7] Plaintiff argues both that the eleventh-grade teacher "imposed th[ese] requirement[s] independently" and that he was "given these requirements" because Plaintiff was the trip organizer. (Pl.'s 56.1, at ¶¶ 80. 83.) Plaintiff also testified that "there have been many instances in which those requirements were not imposed." (Powell Dep., at 75:12-76:17.) However, Plaintiff also noted that students were required to wear their uniforms "[n]ot just for this trip. There have been other trips where they have been required." (*Id.*)

why she kept messing up [Plaintiff's] paperwork." (Powell Dep., at 109:4-7.) But, according to Principal Crocker, who heard about the call from Adams, Plaintiff's daughter "expressed her anger about [Adam's] unprofessionalism" and told Adams, "Remember that I know where you live." (Crocker Dep., at 76:3-15.)

On March 5, 2013, Principal Crocker approved Plaintiff's request for three days of FMLA leave to care for her daughter. (Def.'s 56.1, at ¶¶ 96-97.) However, on March 8, 2013, Plaintiff provided a note from her doctor asking the school to "excuse [Plaintiff's] absence from March 5 through March 7, 2013 due to abdominal pain." (*Id.* at ¶ 95; Dkt. 53-17.) That same day, Plaintiff received a memorandum from Crocker stating that Crocker had arranged for Plaintiff to meet with her on March 11, 2013 in Crocker's office. (Def.'s 56.1, at ¶ 98.) The memorandum indicated that, "[t]he purpose of th[e] meeting is to discuss your abandonment of duty and an alleged threat. Because this meeting may lead to disciplinary action, you may [be] accompanied by your union representative." (*Id.*) On March 11, 2013, Plaintiff, her union representative, and Crocker met. (*Id.* at ¶ 101.) Crocker stated that she had called the meeting to investigate the events that had occurred on March 5, 2013, including Plaintiff leaving the building and her daughter's call to Adams. (*Id.* at ¶ 102.) Crocker told Powell and her union representative that she deemed Plaintiff's conduct on March 5, 2013 an "abandonment of duty because [Powell] didn't return [to her classroom] and we had to look for [her]". (Disciplinary Meeting Transcript ("Disciplinary Tr."), Dkt. 53-19, at 2:15-17.) Crocker also stated that she believed that Adams "was not asked to supply coverage" for Plaintiff's classroom, that "there was no teacher left in the classroom", and that she "was not told that [Plaintiff] was not gonna return back to the classroom." (*Id.* at 4:7, 5:7-7:1.) Plaintiff responded that she had told Adams that she needed coverage. (*Id.*) Crocker went on to state that "[w]e probably wouldn't even be sitting in this meeting because I was gonna call

Ms. Powell that evening to apologize and to let her know that I was going to handle the situation with [Adams] because what -- what was her finding, the student finding her paperwork, the documentation, was unprofessional and that I was gonna deal with that", but "[u]pon hearing that -- later on that day Ms. Powell's daughter called [Adams] and threatened [her] over the telephone", Crocker decided to hold a meeting. (*Id.* at 2:17-3:13; Def.'s 56.1 ¶¶ 104-05.) Plaintiff was not disciplined for abandonment of duty or for the alleged threat. (Def.'s 56.1, at ¶ 110.)

According to Plaintiff, in April 2013, Principal Crocker "in continued harassment of [her], scheduled a meeting with [Plaintiff] for four consecutive days, yet proceeded to cancel the meeting at the last minute on each occasion." (Powell Decl., at ¶ 25.) However, Plaintiff also admits that she did have a post-observation conference with Crocker and Assistant Principal Lewis on April 8, 2013. (Def.'s 56.1, at ¶ 61.) Plaintiff said that this "exacerbate[d] [her] stress and [her] medical conditions, including in particular [her] incontinence and depression." (Powell Decl., at ¶ 25.) On April 6, 2013, Plaintiff filed for disability retirement with the Teacher Retirement System (the "TRS"). (Def.'s 56.1, at ¶ 117.) In her application, she stated that she believed she was incapacitated and could no longer remain in her present position because

> I have suffered with severe gastrointestinal problems since 2004 which has caused me to miss work at times. The severity of the attacks have progressively increased and gotten wors[e]. I awake each day with stomach pains which make my mornings and daily activities extremely difficult. . . . I presently have uncontrollable and unpredictable attacks of incontinence, which I have had to ask for coverage from my classes by staff so that I can run to the bathroom. I am usually stuck in the bathroom for at least a class period. . . . I am sometimes a little late to my next class because I cannot leave the bathroom. . . . I was recently accused of abandoning my duties when I had to run to the restroom due to them sending a person to relieve me who was not a teacher. . . . I feel I am in jeopardy of losing my job due to the condition worsening. I have been able to have some control since 2004 [when the IBS started], but no longer can control or predict the incontinence.

(Applicant's Personal Report of Disability, Dkt. 53-23; *see also* Dkt. 53-5; Dkt. 53-24.) During Plaintiff's deposition, when asked whether she "[sought] to retire in order to avoid being

terminated", she replied, "I [sought] to retire because I could no longer control my bowels . . . [d]ue to the stress and the harassment that had taken place during the 2012, 2013 school year." (Powell Dep., at 121:10-16, 151:23-25; 173:9-176:9; Def.'s 56.1, at ¶ 112.)

On or about May 21, 2013, Plaintiff filed a Notice of Claim with the DOE, alleging disability discrimination. (Powell Dep., at 149:24-151:2.) On May 27, 2013, Plaintiff submitted a Declaration of Intention 2013-2014 Form stating that she "intended to continue in [her] current position at Women's Academy" for the 2013-2014 school year. (Def.'s 56.1, at ¶ 113.) Plaintiff stated at her deposition that she submitted the Declaration despite having applied for disability retirement because she "did not know whether or not [her] disability retirement was going to be approved." (*Id.* at ¶ 114.) On June 17, 2013, Crocker rated Plaintiff "satisfactory" for her year-end rating. (*Id.* at ¶ 111.) That same day, Plaintiff was notified by letter that TRS had approved her disability retirement. (*Id.* at ¶ 120.)[8]

## II. Procedural History

On July 3, 2013, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR"). (Def.'s 56.1, at ¶ 121.) On December 19, 2013, NYSDHR issued a Determination and Order After Investigation finding no probable cause that the DOE had engaged in any unlawful discriminatory practices. (*Id.* at ¶ 122.) On February 12, 2014, the United States Equal Employment Opportunity Commission ("EEOC") adopted NYSDHR's findings and issued Plaintiff a right to sue letter. (*Id.* at ¶ 123.)

Plaintiff commenced this action on April 14, 2014 (Dkt. 1) and filed an Amended Complaint on October 17, 2014 (Dkt. 11). On September 30, 2015, Defendant's motion to dismiss

---

[8] According to Plaintiff, her TRS disability application was approved based on Plaintiff's depression (Powell Dep., at 161:13-15), but there is nothing in the TRS report to support that assertion (*see* TRS Approval Letter, Dkt. 53-25).

was granted, with prejudice, as to Plaintiff's ADA retaliation claim and denied as to Plaintiff's FMLA retaliation and ADA discrimination claims. (Dkt. 21.) Defendant's present motion for summary judgment was fully briefed on August 30, 2017. (Dkt. 50.)

**LEGAL STANDARD**

Summary judgment is appropriate where the submissions of the parties, taken together, "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (summary judgment inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The initial burden of "establishing the absence of any genuine issue of material fact" rests with the moving party. *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010). Once this burden is met, however, the burden shifts to the nonmoving party to put forward some evidence establishing the existence of a question of fact that must be resolved at trial. *Spinelli v. City of N.Y.*, 579 F.3d 160, 166-67 (2d Cir. 2009); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003) (quotation omitted; alteration in original). In other words, "[t]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quotation omitted).

In determining whether a genuine issue of fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). The Court also construes any disputed facts in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48.

## DISCUSSION

### I. Legal Standard

The ADA prohibits an employer from discriminating against "a qualified individual with a disability on the basis of the disability in regard to . . . terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). ADA discrimination claims are subject to the burden-shifting analysis established in *McDonnell Douglas*. *McBride v. BIC Consumer Products Mfg. Co.*, Inc., 583 F.3d 92, 96 (2d Cir. 2009) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Plaintiff asserting a violation of the ADA must prove that: "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability." *Capobianco v. City of N.Y.*, 422 F.3d 47, 56 (2d Cir. 2005). If the Plaintiff establishes a *prima facie* case of unlawful discrimination, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to set forth "some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas*, 411 U.S. at 802.

The FMLA allows eligible employees to take up to twelve weeks per year of unpaid leave because of a serious health condition that makes the employee unable to work. 29 U.S.C. § 2612(a)(1)(D); *see also Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)). The statute further provides that at the end of an employee's leave, she has the right to return to the position she held before taking leave or its equivalent. 29 U.S.C. § 2614(a). The FMLA prohibits an employer from retaliating against an employee "for opposing any practice made unlawful by the [FMLA]". 29 U.S.C. § 2615(a)(1). Claims under the FMLA are also subject to the *McDonnell Douglas* burden-shifting analysis. *Potenza v. City of N.Y.*, 365 F.3d 165, 168 (2d Cir. 2004). "To establish a prima facie case of FMLA retaliation, a plaintiff must establish that (1) [s]he exercised rights protected under the FMLA, (2) [s]he was qualified for [her] position, (3) [s]he suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 147 (2d Cir. 2012) (quoting *Potenza*, 365 F.3d at 168). "If the plaintiff makes out a prima facie case [of FMLA discrimination or retaliation], the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show that defendant's proffered explanation is pretextual." *Graziadio v. Culinary Inst. of America*, 817 F.3d 415, 429 (2d Cir. 2016).

## II. Adverse Employment Action

Assuming *arguendo* that Plaintiff's claims are not procedurally barred or time-barred (*see* Defendant's Brief ("Def.'s Br."), Dkt. 52, at 4-6, 15-17), Plaintiff still cannot establish either her ADA discrimination, FMLA discrimination, or FMLA retaliation claims because cannot show that she suffered an adverse employment action in violation of the FMLA and ADA. The standard for establishing an adverse employment action is the same for both types of claims, *see Behringer v.*

*Lavelle Sch. for Blind*, No. 08-CV-4899 (JGK), 2010 WL 5158644, at *15 (S.D.N.Y. Dec. 17, 2010), particularly where "Powell's ADA discrimination claim arises from the same factual predicate as her FMLA retaliation claim," *Powell v. Dep't of Educ. of City of N.Y.*, No. 14-CV-2363 (PKC), 2015 WL 5772211, at *7 n.9 (E.D.N.Y. Sept. 30, 2015) (citation and internal quotation marks omitted). An adverse employment action includes "materially adverse change[s] in the terms and conditions of employment," such as "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation," or "refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Zelnik v. Fashion Inst. of Tech.,* 464 F.3d 217, 225-26 (2d Cir. 2006) (citations and internal quotation marks omitted); *see also Galavya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000).

In this case, it is undisputed that Plaintiff voluntarily resigned her teaching position. (Def.'s 56.1, at ¶¶ 114, 120.) In this Circuit, "a voluntary resignation is not an adverse employment action unless the employee was constructively discharged." *Chanval Pellier v. British Airways, Plc.*, No. 02-CV-4195 (DGT), 2006 WL 132073, at *4 (E.D.N.Y. Jan. 17, 2006); *see also Lopez v. SB Thomas, Inc.*, 831 F.2d 1184 (2d Cir. 1987). Under the constructive discharge doctrine, "a voluntary resignation will not preclude a finding of an adverse employment action if the plaintiff can show that 'the employer . . . deliberately [made] working conditions so intolerable that the employee [was] forced into an involuntary resignation.'" *Chanval Pellier*, 2006 WL 132073, at *4 (quoting *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir. 1983)). The Second Circuit "has strictly construed the standard for determining whether working conditions are intolerable[;] . . . the proper test is not 'merely whether the employee's working conditions were difficult or unpleasant.'" *Stembridge v. City of N.Y.*, 88 F. Supp. 2d 276, 284 (S.D.N.Y. 2000) (quoting *Spence*

*v. Md. Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993)). A constructive discharge claim is "a 'worst case' harassment scenario, harassment ratcheted up to the breaking point." *O'Neal v. State Univ. of N.Y.,* No. 01-CV-7802 (DGT), 2006 WL 3246935, at *12 (E.D.N.Y. Nov. 8, 2006); *see also Bermudez v. City of N.Y.*, 783 F. Supp. 2d 560, 581 (S.D.N.Y 2011) (holding that a plaintiff's claim must be "more than the recitation of a false syllogism: (1) I am (insert name of a protected class); (2) something bad happened to me at work; (3) therefore, it happened because I am (insert name of protected class)"). Ultimately, "[t]he standard for constructive discharge is a demanding one." *De La Peña v. Metro. Life Ins. Co.,* 953 F. Supp. 2d 393, 419 (E.D.N.Y.2013), *aff'd,* 552 F. App'x 98 (2d Cir. 2014).

In the instant case, even resolving all factual disputes in Plaintiff's favor and considering those facts in the light most favorable to Plaintiff, no reasonable jury could find that Plaintiff's treatment by the DOE was objectively intolerable and that she was constructively discharged. Moreover, the specific examples of hostility that Plaintiff cites, taken together, do not satisfy the demanding standard to find a constructive discharge. In short, "[a]n employee is not constructively discharged because she does not like her assignments, receives unfair criticism, or is yelled at by supervisors." *Katz v. Beth Israel Med. Ctr.*, No. 95-CV-7183 (AGS), 2001 WL 11064, at *14 (S.D.N.Y. Jan. 4, 2001). The Court will discuss each alleged act of discrimination/retaliation in turn.

### A. Plaintiff's Unsatisfactory Ratings

As an initial matter, Plaintiff's reliance on the 2011-2012 unsatisfactory rating to establish her claim of constructive discharge is severely undermined by the fact that Crocker rated Plaintiff satisfactory the next school year. (Def.'s Br., at 10.) In any event, Plaintiff's single negative performance evaluation is insufficient to establish an adverse employment action because there is

"no proof that this evaluation had any effect on the terms and conditions of [plaintiff's] employment." *Sanders v. N.Y.C. Human Res. Admin.,* 361 F.3d 749, 756 (2d Cir. 2004); *see also Farina v. Branford Bd. of Educ.*, 458 F. App'x 13, 17 (2d Cir. 2011) (same); *Jantz v. Emblem Health*, No. 10-CV-6076 (PKC), 2012 WL 370297, at *9 (S.D.N.Y. Feb. 6, 2012) ("[N]egative evaluations without accompanying adverse results are not sufficient to constitute adverse employment actions."). In addition, "a disagreement with management over the quality of an employee's performance will not suffice to establish a constructive discharge[,]" *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996), especially when that disagreement is with a new manager, *Spaulding*, 2015 WL 12645530, at *59 (finding no constructive discharge after the plaintiff was assigned a new supervisor with more demanding performance standards). *See also Davies v. N.Y.C. Dep't of Educ.*, 563 F. App'x 818, 820 (2d Cir. 2014); *Johnson v. N.Y.C. Dep't of Educ.*, No. 10-CV-2604 (WFK), 2014 WL 4090844, at *9 (E.D.N.Y. Aug. 19, 2014). In this case, Plaintiff does not allege that her negative evaluation for the 2011-2012 school year had any impact on her employment, she merely asserts that it was in retaliation for her taking FMLA leave. (Pl.'s Br., at 12-13.)

## B. 2012-2013 Teaching Assignment

To the extent Plaintiff argues that her initial 2012-2013 assignment to teach English rises to the level of constructive discharge, this argument is unavailing. "A constructive discharge generally cannot be established . . . simply through evidence that an employee was dissatisfied with the nature of [her] assignments." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993); *see also Rogers v. Roosevelt Union Free Sch. Dist.*, No. 09-CV-3862 (MKB), 2012 WL 6163130, at *4 (E.D.N.Y. Dec. 7, 2012) (finding that Plaintiff's "complaints . . . [of] denial of preferred classes—are common frustrations that occur in the employment context and are not so

intolerable as to compel a reasonable person to resign") (collecting cases), *aff'd*, 553 F. App'x 88 (2d Cir. 2014). Here, Plaintiff ultimately returned to teaching her preferred history class and she proffers no evidence that her initial assignment for the 2012-2013 school year constituted "a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities", as required to establish constructive discharge. *Zelnik*, 464 F.3d at 225-26; *see also Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006) ("[A] change in job responsibilities is not necessarily an adverse employment action. Neither is underutilization of a [p]laintiff's skills. To be an adverse employment action, these actions must be accompanied by materially adverse changes in employment, such as a demotion or a loss of wages.") (internal citations omitted).

Plaintiff's constructive discharge claim also cannot survive based on the student vote Crocker held regarding Plaintiff's teaching assignment for the 2012-2013 school year. Assuming that a student vote was held regarding if Plaintiff should resume teaching history, the fact of the vote and Plaintiff's embarrassment over it are not sufficient to establish Plaintiff's constructive discharge claim. *See Spence*, 995 F.2d at 1149-54 (no constructive discharge where employer repeatedly criticized plaintiff's work performance, "harangued" plaintiff in front of others, and repeatedly threatened to fire plaintiff); *Soderberg v. Gunther Int'l, Inc.*, 124 F. App'x 30, 32 (2d Cir. 2005) ("The [ADA and FMLA] do[] not make employers liable for petty, stupid, or even wicked decisions; it makes them liable for discriminating[.]")[9]

---

[9] In addition, Plaintiff cannot establish that the class vote Crocker took in October 2012 constituted retaliation against Plaintiff for taking FMLA leave in January 2012 (Pl.'s Br., at 3, 12) for two reasons: (i) the record shows that Crocker extended Plaintiff's medical leave to allow Plaintiff to return six months after her FMLA leave expired, *see Dayes v. Pace Univ.*, 2 F. App'x 204, 208 (2d Cir. 2001) (finding an "intervening positive" event "defeats [plaintiff]'s attempt to establish a causal connection between the two events"), and (ii) six months elapsed between the end of Plaintiff's FMLA leave and the class vote, *see O'Reilly v. Consol. Edison Co. of N.Y., Inc.*, 173 F. App'x 20, 22 (2d Cir. 2006) ("While close temporal proximity can give rise to an inference

### C. Printing of "Lincoln" Poster

Plaintiff claims that Principal Crocker denied Plaintiff classroom resources that had previously made available to her. Specifically, Plaintiff alleges that at Crocker's direction, Assistant Principal Ford refused to print the movie poster for "Lincoln". According to Plaintiff, Ford said that Crocker told Ford that, pursuant to a school-wide policy, Ford was not to make posters for short-term events. (*See* Def.'s 56.1, at ¶¶ 66-67.) As an initial matter, Defendant correctly notes that the printing of the "Lincoln" poster was for Plaintiff's November 28, 2012 classroom observation, which Crocker and Lewis rated satisfactory. (*Id.* at ¶¶ 60, 62.) In any event, Plaintiff's allegation that this purported school-wide policy was targeted at her, because of her disabilities, is belied by her own testimony wherein she testified that this school-wide policy affected the entire staff. (*Id.* at ¶ 69.) Ultimately, Plaintiff's allegation about the poster, even if true, is insufficient to demonstrate a constructive discharge. *See Stoddard v. Eastman Kodak Co.*, 309 F. App'x 475, 479 (2d Cir. 2009) ("[I]nadequate office supplies . . . do not constitute adverse employment actions"); *Rogers*, 2012 WL 6163130, at *4 (noting that defendant's alleged "refus[al] to give [plaintiff] supplies" was insufficient to establish constructive discharge).

### D. "Lincoln" Field Trip

Plaintiff alleges that in December 2012, Crocker attempted to undermine Plaintiff's class trip by imposing last-minute requirements relating to permission slips, attendance, and uniforms. (Powell Decl., at ¶ 18.) However, Plaintiff's testimony, which is the only evidence about these requirements, is contradictory. Plaintiff states both that the eleventh-grade teacher "imposed th[e]

---

of retaliation, the three month gap between [plaintiff]'s FMLA leave and her termination is not sufficient to give rise to an inference of retaliation in light of the additional leave time [defendant]'s policy allowed.") (citation omitted); *Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 587-88 (S.D.N.Y. 2012) ("[C]ourts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation."), *aff'd*, 526 F. App'x 124 (2d Cir. 2013) (citation omitted).

requirement[s] independently" and that he was "given these requirements . . . only because it was Plaintiff's trip[.]" (Pl.'s 56.1, at ¶¶ 80, 83.) Plaintiff also admits that she did not use the permission slips in the form mandated by school policy; thus, the decision to recall them cannot be viewed as discriminatory. (Def.'s 56.1, at ¶ 75-77.) Furthermore, Plaintiff herself testified in her deposition that Women's Academy students were required to wear their uniforms "[n]ot just for this trip. There have been other trips where they have been required". (Powell Dep., at 75:15-18.) Therefore, the only requirement that is potentially applicable to her discrimination claims is the 80% attendance requirement, which was 5% higher than the school's policy of requiring 75% attendance for field trips. However, this minimally enhanced attendance requirement alone is insufficient to state a claim of constructive discharge, particularly where that same requirement was imposed on the eleventh-grade class as well.

### E. March 2013 FMLA Leave Request and Meeting

Plaintiff's claim regarding Adams improperly leaving Plaintiff's FMLA request in a public area and the subsequent meeting held between Plaintiff, Crocker, and Plaintiff's union representative (regarding Plaintiff's resulting midday departure from the school and the telephone conversation between Plaintiff's daughter and Adams), do not support a constructive discharge claim. First, Plaintiff has proffered no facts showing that Adams purposely placed the forms in the public area, *see Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2001) ("[C]onstructive discharge . . . requires deliberate action on the part of the employer[;] . . . something beyond mere negligence or ineffectiveness is required."), and even if Adams did so, that would not be enough to impute a retaliatory or discriminatory motive to Adams's employer, the DOE, *see Lioi v. N.Y.C. Dept. of Health & Mental Hygiene*, 914 F. Supp. 2d 567, 593-594 (S.D.N.Y. 2012) ("[T]he fact that certain non-decision-makers may have a motive to retaliate has

little tendency to show that the actual decision-maker was motivated by retaliatory animus."). Similarly, the fact that Crocker summoned Plaintiff to a factfinding meeting does noes not rise to the level of constructive discharge where, as here, no disciplinary charges were issued. *See Rozenfeld v. Dept. of Design & Constr.*, 875 F. Supp. 2d 189, 204 (E.D.N.Y. 2012) ("[M]erely being summoned to an investigative interview does not give rise to a constructive discharge claim" when the "[p]laintiff was not presented with actual disciplinary charges, nor . . . threatened with being fired"), *aff'd*, 522 F. App'x 46 (2d Cir. 2013); *see also Tepperwien v. Entergy Nuclear Operations, Inc.,* 663 F.3d 556, 568-71 (2d Cir. 2011) (affirming the district court's determination that three investigative factfinding meetings were not retaliatory).

### F. Plaintiff's Retirement

Finally, despite Plaintiff's claim that she was advised by her medical doctor and gastroenterologist to retire "due to the harassment she was suffering which was causing her condition, including her depression, to worsen" (Pl.'s Br., at 7), the record is clear that Plaintiff only retired from the DOE once she learned that her disability retirement had been approved. In fact, Defendant sought to retain Plaintiff as a teacher, including by giving Plaintiff a satisfactory year-end rating. On May 27, 2013, Plaintiff submitted a Declaration of Intention stating that she "intended to continue in [her] current position at Women's Academy" for the 2013-2014 school year. (Def.'s 56.1, at ¶ 113.) At her deposition, when asked why she had submitted a Declaration of Intention Form when she had already applied for disability retirement, Plaintiff testified that she "did not know whether or not my disability retirement was going to be approved." (*Id.* at ¶ 114.) Thus, Plaintiff cannot show that her retirement was caused by any alleged harassment at work; indeed, if anything, the undisputed evidence supports the conclusion that Plaintiff's retirement was requested by her, and granted, based on her disability claim.

In *Dawson v. City of New York*, the court found that the plaintiff failed to demonstrate constructive discharge where

> the undisputed evidence show[ed] that she voluntarily resigned. [Plaintiff] did not retire . . . when she received the "Unsatisfactory" evaluation . . . but instead retired at the end of the [following] school year after a new principal . . . gave her a "Satisfactory" rating. Moreover, [plaintiff] admitted at her deposition that she voluntarily retired at the end of the . . . school year . . . [and] that her retirement was motivated by her belief that she was entitled to full benefits at that time.

No. 09-CV-5348 (PGG), 2013 WL 4504620, at *11 (S.D.N.Y. Aug. 19, 2013). Similarly, in this case, Plaintiff cannot credibly contend that she was constructively discharged when she was rated "satisfactory" for the 2012-2013 school year and when the only factor she considered in deciding whether she would leave DOE was whether she would receive disability benefits upon her resignation. *See Whidbee*, 223 F.3d at 74 (finding no constructive discharge because the "[defendant] demonstrated an interest in retaining the plaintiffs"); *Chuang v. T.W. Wang Inc.*, 647 F. Supp. 2d 221, 239 (E.D.N.Y. 2009) ("It is difficult to impute bias against the plaintiff's protected class where the person making the adverse employment decision against plaintiff also made a recent favorable employment decision regarding plaintiff."). But even assuming Crocker, Ford, and Lewis were intentionally attempting to exacerbate Plaintiff's medical conditions to incite her to retire, that is still not sufficient to establish constructive discharge. *See Spence*, 995 F.2d at 1156 ("[T]he fact that an employee develops stress-related ill health from the demands of [her] voluntarily undertaken position or from criticisms of [her] performance, and as a result determines that health considerations mandate [her] resignation, does not normally amount to a constructive discharge by the employer."); *Holowecki v. Fed. Exp. Corp.*, 644 F. Supp. 2d 338, 358-59 (S.D.N.Y. 2009), *aff'd*, 382 F. App'x 42 (2d Cir. 2010) (same).

## G. Viewing Plaintiff's Claims Collectively

When considered individually, none of Plaintiff's claims rise to the level of constructive discharge. However, working conditions must also be viewed, "as a whole," because "[a] reasonable person encounters life's circumstances cumulatively and not individually." *Chertkova*, 92 F.3d at 91. Considered collectively, Plaintiff's claims still do not rise to the level of constructive discharge. *See Rogers*, 2012 WL 6163130, at *4 (finding no constructive discharge, even when considering collectively plaintiff's claims that "[d]efendants assigned her to multiple classrooms; refused to give her supplies . . .; omitted her from the 'all high school teachers' e-mail listserv; refused to accommodate her teaching preferences; changed failing grades to passing grades; made errors in her health insurance deductibles; miscalculated her sick days, which affected her position on the seniority list; and failed to inform her of the opportunity to participate in the after school program."); *see also Spence*, 995 F.2d at 1149-54 (no constructive discharge where employer repeatedly criticized plaintiff's work performance, "harangued" plaintiff in front of others, and repeatedly threatened to fire plaintiff).[10] Here, the Court finds that the combination of Plaintiff's

---

[10] Even if Plaintiff could show that she suffered constructive discharge or any other adverse employment action for purposes of her ADA and FMLA claims, she has failed to establish under the ADA that she suffered such an action *because of her disability. McBride*, 583 F.3d at 96. The only specific evidence of causation Plaintiff presents in support of her claim is her TRS personal disability report, in which *she* asserted, "I was recently accused of abandoning my duties when I had to run to the restroom due to them sending a person to relieve me who was not a teacher. . . . I feel I am in jeopardy of losing my job due to [my incontinence] worsening." (Dkt. 53-23.) However, this statement is directly contradicted by Plaintiff's own repeated assertions that she was accused of abandonment of duty in retaliation for leaving the school grounds after learning that her FMLA paperwork was left on a student's desk. (*See, e.g.*, Pl.'s Br., at 6, 15; Powell Decl., at ¶¶ 20-22.) The lack of causation evidence constitutes an independently sufficient ground on which to grant Defendant's motion for summary judgment on Plaintiff's ADA discrimination claim. *Krachenfels v. N. Shore Long Island Jewish Health Sys.*, No. 13-CV-243 (JFB)(WDW), 2014 WL 3867560, at *14 (E.D.N.Y. July 29, 2014) (jury must be able to "conclude by a preponderance of the evidence that [her] disability was at least 'a motivating factor' for the adverse employment action") (citation and quotation marks omitted); *see also Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 108 (2d Cir. 2001) ("[I]t remains essential to a finding of discrimination that plaintiff's

multiple complaints about her work conditions—including a negative teaching evaluation, inadequate classroom resources, and an undesirable teaching assignment—even when viewed in the light most favorable to Plaintiff, do not rise to the level of constructive discharge.

## CONCLUSION

For the reasons stated, Defendant's motion for summary judgment is granted.  The Clerk of Court is respectfully requested to enter judgment and terminate this case.


SO ORDERED.


/s/*Pamela K. Chen*
PAMELA K. CHEN
United States District Judge


Dated: Brooklyn, New York
       August 30, 2018

---

disability, or the lack of accommodation to that disability, played a substantial role that made a difference to his employer's actions.") (internal quotation marks omitted).

Additionally, the Court will not consider Plaintiff's claim, raised for the first time in opposition to summary judgment, that she was subjected to a hostile work environment in violation of the ADA.  (Pl.'s Br., at 19.)  "It is well settled that a party may not amend its pleadings in its briefing papers."  *Enzo Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 223 (S.D.N.Y. 2013); *see also Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012).